PIERINGER V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-017-CR

DEBORAH LYNN PIERINGER APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

OPINION

------------

Appellant Deborah Lynn Pieringer appeals her capital murder conviction, arguing that 1) her trial counsel rendered ineffective assistance of counsel and 2) the evidence is factually and legally insufficient to support her conviction.

Factual and Procedural Background
 

Loyd Courtney worked for the Fort Worth Police Department for approximately fifty years.  He first served as a member of the police department and later became a fingerprint expert.  On November 2, 2001, neighbors noticed that Mr. Courtney did not leave for his afternoon shift at the police department.  At approximately 5:30 p.m., Officer Mike Galusha was called out to the Courtneys’ home to perform a welfare check.  After obtaining entry into the home with a neighbor’s key, Galusha discovered the bodies of Mr. Courtney and his wife Agnes, which had been beaten with four cast-iron skillets, stabbed, and cut with a knife.  Mr. Courtney was found on the kitchen floor near the dining room table with a typed note resting on his thigh.  The note, implying that the murders were revenge for Mr. Courtney’s role in sending a defendant to prison in his capacity as a fingerprint analyst with the Fort Worth Police Department, had a paring knife inserted through it.  Mrs. Courtney was found in a back bedroom lying face down in a pool of blood.  The medical examiner testified that Mr. Courtney suffered at least seven cut wounds, twelve stab wounds, and seventeen blunt force trauma injuries on his body.  Likewise, Mrs. Courtney had seven cut wounds, fifteen stab wounds, and seventeen blunt force trauma injuries.

The police found the pieces of four cast-iron skillets, which were shattered in the attacks, as well as a broken end table.  There were no signs of forced entry into the home and all the doors were locked.  In the kitchen, the wire to the telephone had been cut, and in one of the bedrooms, the wire to the caller identification box had been cut and the computer dumped on the floor.  An analysis of the computer showed that Microsoft Word was accessed at 9:57 a.m., that it was the only program used on the computer that day, and that a document was sent to the printer at 10:01 a.m.  The computer was shutdown at 11:19 a.m.

The police found grocery bags, with the groceries still inside, sitting on the kitchen floor and the contents of Mrs. Courtney’s purse spread out on a credenza in the kitchen.  The Courtneys’ trash was dumped out onto the floor in the utility room and the liner from the trash can was missing.  Back in one of the bedrooms where Mr. Courtney apparently kept his things, the room was undisturbed except for one dresser drawer that was pulled out and dumped onto the floor.  Although the police found several wallets in that room, they did not recover a wallet with a driver’s license or insurance card that would indicate the wallet was being used by Mr. Courtney at the time of his murder.  No blood was found in any of the sinks or bathtubs in the house.  Crime scene search unit officer Patrick Gass also testified that all of the sinks and bathtubs were dry, leading him to conclude that if the killer washed up after the murders, it was not in the bathrooms or the kitchen sink.

Appellant is the Courtneys’ daughter.  According to Appellant, she arrived at her parents’ home around 8:15 or 8:30 on the morning of the murders to collect a receipt for some trees purchased by Mrs. Courtney as a gift for Appellant’s husband, Paul Pieringer.  When she arrived, Mr. Courtney was playing on the computer and Mrs. Courtney was away from home running errands.  Mrs. Courtney returned home around 9:30 a.m. and Appellant left about an hour later.

Dr. Maria Abalos, a veterinarian living behind the Courtneys, worked overnight shifts and typically slept during the day.  On November 2, 2001, Dr. Abalos went to sleep around 10:00 a.m. only to be awakened sometime before 1:00 p.m. by her two dogs’ constant barking.  Despite being well-trained dogs, they would not come to Dr. Abalos when she called them.  After several attempts to call the dogs, Dr. Abalos walked to the edge of her backyard to retrieve one of the dogs.  When she reached the dog, she noticed that it was barking at a man in the Courtneys’ backyard wearing blue coveralls.  After the Courtneys’ bodies were discovered, Dr. Abalos assisted police in drawing a composite of the man she saw in the backyard.

Appellant was arrested after DNA tests revealed that her blood was found in six different places inside the Courtneys’ house.  Police officers testified that in their discussions with Appellant, and later at the Courtneys’ funeral, they noticed cuts on her hand and bruises on her arms consistent with someone grabbing Appellant’s arms.  Appellant explained the bruises by claiming that she fell down the stairs as she was leaving her home to pick up her daughter from school on the day of the murders.  Appellant testified that the blood came from a cut on her hand received while doing dishes at her home and reopened while doing dishes at the Courtneys’ house.  The State did not produce any evidence that it found blood in Appellant’s vehicle, on her clothes, or in any other location that would further connect her to the crime. 

The State produced a handwritten itinerary found in Appellant’s home that outlined her activities on the day of the murders.  Appellant wrote in the itinerary that she arrived at her parent’s home around 10:00 a.m. and left shortly thereafter, contradicting her testimony that she arrived at the Courtneys’ house between 8:15 and 8:30 a.m.  In the itinerary, Appellant stated that she cut her finger on a knife while washing dishes and then later ripped the cut open while picking up rocks in her yard.  The police also searched Appellant’s car and found a book in the trunk entitled, “How to Live and Die with Texas Probate.”

Appellant and her husband admitted that they relied on the Courtneys for financial support for many years.  The State, contending that Appellant was motivated by money, offered evidence that Appellant was a beneficiary of the Courtneys’ estate and stood to inherit approximately $225,000.  After a four-day trial, a jury found Appellant guilty of capital murder and the trial court sentenced her to life in prison.

Ineffective Assistance of Counsel

In Appellant’s first issue, she argues 
that her trial counsel was ineffective in 1) failing to discuss any area of law applicable to the case or probation eligibility during voir dire, 2) failing to ask questions during voir dire that were designed to enable an intelligent exercise of peremptory strikes or challenges for cause, 3) failing to properly investigate defenses, obtain expert witnesses, and examine the State’s evidence, 4) failing to request the lesser included offense of murder in the jury charge, and 5) failing to object to numerous objectionable and inadmissible items throughout the trial.

We apply a two-pronged test to ineffective assistance of counsel claims.  
Strickland v. Washington
, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); 
Thompson v. State
, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  First, Appellant must show that her counsel's performance was deficient; second, Appellant must show the deficient performance prejudiced the defense.  
Strickland
, 466 U.S. at 687, 104 S. Ct. at 2064. 

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case.  
Thompson
, 9 S.W.3d at 813.  The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.  
Strickland
, 466 U.S. at 688-89, 104 S. Ct. at 2065.  “[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.”  
Id.
 at 690, 104 S. Ct. at 2066.  An allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.  
Thompson
, 9 S.W.3d at 814.  Our scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight.  
Strickland
, 466 U.S. at 689, 104 S. Ct. at 2065.

The second prong of 
Strickland
 requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable.  
Id.
 at 687, 104 S. Ct. at 2064.  In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  
Id.
 at 694, 104 S. Ct. at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  
Id.
  The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.  
Id.
 at 697, 104 S. Ct. at 2070.

The defendant bears the burden to prove ineffective assistance of counsel by a preponderance of the evidence.  
Thompson,
 9 S.W.3d at 813.  A defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. 
 Gamble v. State,
 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.).  The defendant's burden is even more difficult when, as in this case, the defendant does not file a motion for new trial asserting ineffective assistance of counsel.  
See Jackson v. State,
 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); 
Gibbs v. State
, 7 S.W.3d 175, 179 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).  Assertions of ineffective assistance of counsel must be firmly founded in the record.  
Bone v. State,
 77 S.W.3d 828, 835 (Tex. Crim. App. 2002).  Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective and an appellate court will not find ineffectiveness based on speculation.  
Id.
 at 836; 
Henderson v. State
, 29 S.W.3d 616, 624 (Tex. App.—Houston [1st Dist.]  2000, pet. ref'd).  However, “in the rare case where the record on direct appeal is sufficient to prove that counsel's performance was deficient, an appellate court should obviously address the claim.”  
Robinson v. State
, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000).

Appellant first contends that her trial counsel’s voir dire fell well below an objective standard of reasonableness under prevailing professional norms.  Appellant argues that her counsel failed to ask questions regarding any area of law applicable to the case and instead focused on what bumper stickers each individual juror had on his or her car.  Further, trial counsel did not address probation or ask questions designed to determine whether the views of prospective jurors would justify a challenge for cause or peremptory strike.

The purpose of voir dire questioning is to determine whether a potential juror should be challenged for cause or peremptorily, or whether he or she should be accepted by the examining party for service on the jury.  
Goodspeed v. State
, 120 S.W.3d 408, 411 (Tex. App.—Texarkana 2003, pet. granted) (citing 
Eason v. State
, 563 S.W.2d 945, 946-47 (Tex. Crim. App. [Panel Op.] 1978)).  A thorough review of the voir dire record indicates that Appellant’s counsel asked several questions that could have been motivated by trial counsel’s desire to elicit information that would be helpful in identifying possible challenges for cause or peremptory strikes.  Appellant’s trial counsel questioned jurors regarding their misdemeanor records, past trial experiences as jurors and litigants, and special knowledge regarding forensics.  Although we do not have the benefit of testimony regarding counsel’s trial strategy, the voir dire record reflects a hint of trial counsel’s rationale behind the bumper sticker questions.  During voir dire, Appellant’s counsel explained to the jury that he would ask each one of them what bumper stickers they had on their cars because “normally these things say something about you.”  As an example, he noted, “[i]f you have, let’s say, a Deputy Sheriff’s Association sticker on your car, that would be something nice to know.”

Appellant complains that her trial counsel did not determine which jurors were unable to consider the full range of punishment, claiming that upon a conviction of a lesser included offense of murder, Appellant would have been eligible for community supervision. 
 See 
Tex. Code Crim. Proc. Ann. 
art. 42.12 § 4(e) (Vernon Supp. 2004).  Responding, the State argues that this was a capital murder case in which probation would not be an issue for the jury to decide.  
See 
Tex. Penal Code Ann.
 § 12.31(a) (Vernon 2003), § 19.03 (Vernon Supp. 2004).  Although unclear, the State appears to argue that because trial counsel stated in his opening statement that the only real issue was whether Appellant cut her finger while she was committing this crime or earlier in the day, counsel was conceding that the Courtneys were murdered during the same criminal transaction, thus meeting the requirements for capital murder.  In the present case, the record provides no explanation or inquiry into possible tactical reasons for counsel’s failure to address probation eligibility and areas of the law applicable to the case and thus fails to rebut the strong presumption of reasonable counsel during Appellant’s voir dire.  
See Thompson
, 9 S.W.3d at 813.  

Appellant also claims that trial counsel was ineffective in failing to properly investigate defenses, obtain expert witnesses, and examine the State’s evidence.  According to Appellant, trial counsel made no effort to impeach or investigate the State’s evidence that Appellant’s blood was found in six different places.  Further, Appellant asserts that there can be no trial strategy in failing to at least request an expert to review or examine the State’s laboratory results concerning the DNA findings or question the expert outside the jury’s presence regarding the expert’s qualifications, potential rate of error in the technique, or reliability of the testing.  Instead, trial counsel simply conceded that Appellant’s blood was found in six places within the Courtneys’ home.  Likewise, Appellant argues that her trial counsel should have independently tested hairs found in Mrs. Courtney’s hand, fingerprints found at the scene, and the State’s computer analysis.  Appellant also complains that her trial counsel failed to object to numerous objectionable and inadmissible items throughout the trial, and should have requested the lesser included offense of murder in the jury charge.

The record before us is silent as to why Appellant's trial counsel did not request the appointment of an expert witness or rebut the State’s blood evidence.  The record is also silent as to why Appellant's trial counsel did not object to various objectionable and inadmissible items throughout the trial.  Appellant has failed, therefore, to rebut the presumption that these actions were part of her trial counsel's sound trial strategy.  To find that trial counsel was ineffective based on the asserted grounds would call for speculation, which we will not do. 
 See
 
Jackson v. State
, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); 
Gamble
, 916 S.W.2d at 93.  Only on further inquiry can an adequate determination be made as to whether counsel provided Appellant with effective assistance.  
A thorough review of the record before us indicates that this is not one of those “rare cases” in which we can assess counsel's performance on a silent record.  
See Robinson
, 16 S.W.3d at 813 n.7.  In this instance, an application for writ of habeas corpus is the more appropriate vehicle for Appellant’s claim.  
See id. 
at 814 (Mansfield, J. dissenting).  An application for writ of habeas corpus relief would “provide an opportunity to conduct a dedicated hearing to consider the facts, circumstances, and rationale behind counsel’s actions at . . . trial.”  
Thompson
, 9 S.W.3d at 814-15.  We overrule Appellant’s first issue.  

Factual and Legal Sufficiency

In Appellant’s second issue, she contends that the evidence is factually and legally insufficient to support her conviction.  The court of criminal appeals has recently restated and clarified the standard of review to be used by appellate courts in reviewing the factual sufficiency of the evidence to support a conviction.  In 
Zuniga v. State
, the court held:

There is only one question to be answered in a factual sufficiency review:  Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt?  However, there are two ways in which the evidence may be insufficient.  First, when considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt.  Second, there may be both evidence supporting the verdict and evidence contrary to the verdict.  Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand.  This standard acknowledges that evidence of guilt can “preponderate” in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.  Stated another way, evidence supporting guilt can “outweigh” the contrary proof and still be factually insufficient under a beyond-a- reasonable-doubt standard.

No. 539-02, 2004 WL 840786, at *7 (Tex. Crim. App. Apr. 21, 2004).

To make a determination of factual insufficiency, a complete and detailed examination of all the relevant evidence is required.  
Johnson v. State
, 23 S.W.3d 1, 12 (Tex. Crim. App. 2003).  A proper factual sufficiency review must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  A factual sufficiency review of circumstantial evidence is the same as a review of direct evidence.  
King v. State
, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  When performing a legal sufficiency review, we may not sit as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  The standard of review is the same for direct and circumstantial evidence cases.  
Burden
, 55 S.W.3d at 613; 
Kutzner
, 994 S.W.2d at 184.

Appellant, in support of her assertion that the evidence is insufficient to support her conviction, points to many instances wherein the evidence used by the State to support her guilt could be viewed as wholly innocent conduct.  Appellant first contends that the evidence established a valid reason for her appearance at the Courtneys’ home on the day of the murders.  Both Appellant and her husband testified that Mrs. Courtney gave Mr. Pieringer two trees for his birthday, which were to be delivered and planted at the Pieringers’ home on November 2, 2001.  According to Appellant, she went to the Courtneys’ home to pick up the receipt for the trees and some concert tickets to see Mrs. Courtney’s upcoming performance in the Sweet Adelines Barbershop Chorus for Women.  Appellant gave the receipt to her trial counsel, and a copy of the receipt was admitted into evidence.  In response, the State argues that the evidence did not prove that Appellant picked up the receipt on the day of the murders—only that Appellant picked up the receipt some time before the murders occurred.  The State also points out that possession of the receipt does nothing to establish that Appellant was not guilty because she could have picked up the receipt and then murdered her parents before she left the house. Appellant next contends that she provided a reasonable explanation for the minimal amount of her blood found at the Courtneys’ house.  Appellant testified that she cut her finger earlier in the day while washing dishes and then reopened the cut while washing dishes at the Courtneys’ home the day of the murders.  Fort Worth police officer Tom Boetcher testified that when he went to inform Appellant that her parents had been murdered, he noticed two cuts on her left index finger—one on the palm side and one on the outer side.  Appellant stresses that her blood was not found mixed with the victim’s blood anywhere in the house and that the State did not produce any evidence to show that her blood was left at the scene at the time of the murders as opposed to before the murders occurred.

The State, in turn, disagrees with Appellant’s characterization of the blood found at the scene of the crime as “minimal,” describing some of the six locations where Appellant’s blood was found as a large amount.  Appellant’s blood was found on the dining room table, within a foot of Mr. Courtney’s body, on a kitchen drawer where knives were kept, on the exterior surface of the bedroom door where Mrs. Courtney’s body was found, on a mirror attached to the exterior side of the same bedroom door, on the caller identification box for which the wires had been cut, and on the lid of the trash can that was dumped out on the floor.  Jim Varnon, a detective for the Fort Worth Police Department, described the amount of Appellant’s blood on the mirror as “a significant amount of blood.  It’s quite visible, hard to miss.”  He additionally testified that the blood found on the kitchen drawer was taken from a “visible bloodstain.”  Detective Matthew Hardy agreed that the amount of blood on the mirror was “a lot” of blood, not a “little.”

Appellant argues that if she had obtained the knife from the kitchen drawer in order to commit the murders as the State contends, there would not have been any blood on her at the time she retrieved the knife from the drawer.  Rather, Appellant argues that the more logical explanation for her blood being on the drawer is that she opened up the drawer after reopening the cuts on her fingers while doing dishes at the Courtneys’ house.  Under the State’s theory, however, Appellant attacked Mr. Courtney first with a skillet or the broken end table found in the living room, disabling him to some extent, before grabbing the paring knife from the kitchen drawer to finish the attack.  The Tarrant County Medical Examiner, Dr. Nizam Peerwani, testified that Mr. Courtney’s blunt force trauma injuries were likely defensive wounds, while the cut wounds on his neck were “coup de grace” wounds.  Dr. Peerwani defined “coup de grace” wounds as being produced when the victim is no longer able to defend himself for the purpose of ensuring that the victim is dead.  Appellant additionally claims that if she was the murderer, she would have known to clean up inculpatory evidence such as her blood located in what she describes as “obvious” locations.  The State contends, however, that due to the large amount of blood found at the scene, it would have been impossible for her to distinguish her blood from the victims’ blood.

According to Appellant, evidence offered at trial points to her innocence rather than her guilt in several additional instances.  First, Appellant refutes the sufficiency of the State’s evidence that the note left on Mr. Courtney’s leg was written and printed at the scene.  Troy Lawrence, a Fort Worth police officer and computer forensic analyst, testified that Microsoft Word was accessed at 9:57 a.m. on the day of the murders, that an unsaved document was created and sent to the printer at 10:01 a.m., and that the computer was shut off at 11:19 a.m.  Notably, Appellant testified that Mr. Courtney was playing on the computer when she arrived at the house around 8:15 or 8:30 that morning.

Second, Appellant argues that the evidence does not support the State’s theory that Appellant’s motive for murder was financial gain because the evidence clearly showed that the Courtneys provided her with financial support for many years.  Furthermore, Appellant points out that possession of a book on probate law purchased 
after
 the murders is more indicative of innocent behavior exhibited by a co-executor of her parents’ estate than it is of an individual trying to conceal murder.

Third, Appellant points out that, given the violence of the murders, it is unlikely that the killer would escape with only two cuts on her finger.  In fact, Dr. Peerwani testified that it would be highly unlikely for someone to deliver seventy-five blows without being covered with the blood of the victims.

Fourth, evidence that there was no forced entry and that the doors were all locked when the Courtneys were found does not exclude the possibility that a stranger committed the murders.  There is no evidence on the record that Appellant had a key to her parents’ home and there was testimony that no garage door openers were found at the scene.  Moreover, there was no evidence that the Courtneys’ door was not the type of door that automatically locks when the door is shut.

Fifth, Appellant strongly emphasizes the fact that no blood was found in her car or on any of her clothing despite the fact that she undisputedly drove her car home from the Courtneys’ house on the day of the murders.  Appellant urges that the lack of blood in any of the drains, coupled with testimony that none of the drains were wet, indicates that there was not an attempt to clean up the scene, making it a “virtual impossibility” that she committed these violent murders and then drove her car without leaving a trace of blood.  The State argues that there was a clean up, as evidenced by the missing trash can liner and handles for three of the iron skillets used in the murders.  The State’s theory is that the killer cleaned up in some fashion and then used the trash can liner to carry away evidence.

Finally, Appellant argues that the State’s evidence regarding the computer establishes that Appellant was gone from the house when the computer was turned off.  The Courtneys’ neighbor, Mabel Szabo, testified that she saw Appellant near her car between 10:15 and 10:25 that morning and according to the State’s computer forensic analyst, the computer was not shut off until 11:19 a.m.  Ms. Szabo did not, however, testify that she saw Appellant leave—only that she saw Appellant near her car around 10:15 a.m. and that when she returned to her house just before noon, Appellant’s car was gone.

While many of Appellant’s arguments successfully point out that the State’s evidence could also be interpreted in a manner consistent with Appellant’s innocence, the evidence is such that a rational jury could have found beyond a reasonable doubt that Appellant was guilty.  Moreover, after examining the evidence in a neutral light, we find that the supporting evidence is not so weak, nor is the contrary evidence so overwhelmingly strong, as to render the verdict clearly wrong and manifestly unjust.  The jury was free to believe the State’s theory, especially in light of Appellant’s behavior that would logically lessen her credibility in the eyes of the jurors.  Appellant’s accounts of that day were inconsistent.  She initially told police that she arrived at the Courtneys’ home around 10:00 a.m. and stayed for just a few minutes.  Her written itinerary, written a few days after the murders, also indicates that she arrived around 10:00 a.m.  Later, Appellant told police that she went to her parents’ house around 8:15 or 8:30 a.m. and stayed until 9:45 a.m.  Then at trial, Appellant testified that she arrived at the home between 8:15 and 8:30 a.m. and stayed until 10:30 or 10:45 a.m.  The jury, as trier of fact, is entitled to resolve any conflicts in the evidence, to evaluate the credibility of witnesses, and to determine the weight to be given any particular evidence.  
See Jones v. State
, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996), 
cert. denied
, 522 U.S. 832 (1997).  We overrule Appellant’s second issue. 

Conclusion

Having overruled both of Appellant’s issues, we affirm the trial court’s judgment.

 

DIXON W. HOLMAN

JUSTICE

PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

PUBLISH

DELIVERED:  June 17, 2004