Affirmed and Memorandum Opinion filed September 9, 2008








Affirmed and Memorandum Opinion filed September 9, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00637-CR

____________

 

CLIFTON TOMMIE POWERS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 174th
District Court

Harris County, Texas

Trial Court Cause No. 1064723

 



 

M E M O R A N D U M   O P I N I O N

Appellant, Clifton Tommie Powers, was indicted on the
felony offense of murder.  The jury convicted appellant, and the trial court
sentenced him to thirty years= confinement in the Texas Department of
Criminal Justice, Institutional Division.  In two issues, appellant contends
that the evidence supporting the verdict is factually insufficient, and that
the trial court erred in overruling his objection to an improper jury argument
made by the State at punishment.  We affirm.








Factual
and Procedural Background

On the evening of April 8, 2006, the complainant, Willie
Powers, attended a birthday party with her daughter, Keli Powers.  Keli drove
the complainant to and from the party.  Keli testified that she dropped the
complainant off at her home shortly after 9:00 p.m., and that, at this time,
the complainant=s vehicle was Apulled straight in@ the driveway.

 At 9:56 p.m., Officer Dameon Wheeler of the Houston Police
Department was dispatched to the complainant=s address in
response to a shooting in progress.  When he arrived, he went to the front door
of the complainant=s home.  He testified that the door was
open, and he heard appellant screaming, AI shot my wife,
somebody help me.@  Officer Wheeler entered the home and
found appellant kneeling over the complainant, who was lying on the kitchen
floor.  Officer Wheeler also observed a revolver at the complainant=s feet.  He picked
up the revolver, removed four live rounds and one spent casing from the weapon,
and then asked appellant what happened.

Appellant responded, AWe were arguing. 
I=ve been drinking
all day.  I was playing with the gun.  It jumped out of my hand.  I caught it
by the trigger and I shot her in the chest.@  Appellant
demonstrated the motion for Officer Wheeler, who testified that appellant Ahad his hands out@ and was moving
them up and down unevenly.

Paramedics eventually arrived at the scene and treated the
complainant.  Officer Wheeler took appellant from the kitchen and placed him on
the couch in the living room.  Appellant kept repeating his version of events
to Officer Wheeler.  At one point, appellant added, AI=m a gun man.  I
should know better because I=m a gun man, I know about guns, but it
jumped out of my hand and I caught it by the trigger and shot her in the chest.@ Appellant also
repeatedly asked Officer Wheeler about the condition of the complainant, and
whether she was dead.  Officer Wheeler testified that, at one point, appellant
remarked, AIf she=s dead, just take your gun and shoot me
right now.@








Sergeant K.L. Barnes arrived at the scene just before
paramedics transported the complainant to Ben Taub Hospital.  When Sergeant
Barnes entered the home, she observed appellant seated on the couch with other
officers surrounding him.  Sergeant Barnes overheard appellant telling the
officers that the shooting was an accident, that it happened when he was Ajuggling the gun,@ and that he was
telling his wife Ato look how pretty it was.@  Appellant also
explained that as he was juggling the revolver, he threw it too high in the
air, and when it came down, he caught it, and it went off accidentally. 
Sergeant Barnes then asked appellant how long he had owned the revolver. 
Appellant responded that he had owned it Afor about ten
years.@  Sergeant Barnes
then asked appellant why, if he had owned the revolver for ten years, it was
necessary to bring it out that night and show it to the complainant.  Sergeant
Barnes testified that appellant just shrugged his shoulders, and did not answer
the question.

Sergeant Barnes then moved appellant from the couch to a
chair located on the front porch.  Appellant then told Sergeant Barnes that he
wanted to tell her what really happened.  Appellant related that he and the
complainant had been drinking, and that they had been arguing.  He explained
that he wanted to leave the house, but the complainant did not want him to
leave.  He also explained that he went and retrieved the revolver in order to
show the complainant that he had protection, and that he would be safe if he
left the house.  Appellant was then handcuffed and placed in the back of a
patrol car.

Officer Xavier Budd arrived at the scene shortly
thereafter. Sergeant Barnes assigned responsibility for appellant and the
revolver to Officer Budd.  Officer Budd then transferred appellant to the back
of his patrol car, and awaited the arrival of detectives from the Homicide
Division.








Sergeants G. Gonzales and John Roberts of the Homicide
Division then arrived at the scene.  Sergeant Roberts directed Officer Budd to
transport appellant downtown, where he was to be questioned.  Officer Budd
testified that, during the drive downtown, appellant Aseemed somewhat
distraught,@ Awas crying,@ Aasked about his
wife,@ and maintained
that he was playing with the gun, and that the shooting was an accident. 
Appellant also stated that he feared telling his children that he had killed
their mother.  Officer Budd testified that these statements were volunteered,
and that he did not question or otherwise encourage appellant to speak or to
make any statements.

When they arrived, Officer Budd took appellant to an
interview room, removed his handcuffs, and awaited the arrival of Sergeants
Gonzales and Roberts.  In the interview room, appellant repeated his version of
the events to Officer Budd.  Appellant stated that he had been drinking most of
the day, and that he and the complainant had an argument Aearlier in the
day.@  Appellant
specified that he and the complainant  were not arguing, and that he was Anot mad,@ at the time of
the shooting.  He explained that he was playing with the revolver, that it went
off accidentally, and that he knew it wasn=t a good idea to
handle a gun when he had been drinking.

Appellant demonstrated how he was Aplaying@ with the gun to
Officer Budd, who testified that appellant Amoved his hands
back and forth and up and down to motion that he was juggling the gun.@  Officer Budd
also testified that appellant=s palms Awere open, facing
up, up and down@ during his demonstration, and that
appellant made no motion as if he were Aspinning@ the gun. 
Appellant explained to Officer Budd that the gun had Aslipped,@ and that it had
fired when he tried to Acatch@ it against his
body.  He stated that he put one hand underneath the revolver and Agrasped@ it against his
body with the other hand.

Appellant also demonstrated how he claimed to have caught
the revolver against his body. Officer Budd testified that, during his
demonstration, appellant put his left hand in a cupping motion, and placed his
right hand at the level of his chest.  Officer Budd also testified that
appellant never made any statements to him regarding catching the revolver with
his finger on the trigger.








Appellant told Officer Budd that he was very sorry about
the incident, and that he was afraid to tell his children about what had
happened because he feared they would be upset.  Officer Budd testified that,
at one point, appellant asked him for his revolver because he wanted to shoot
himself.  According to Officer Budd, during the time appellant was in his
custody, appellant cried off and on, Aoccasionally@ asked about the
complainant=s welfare, and was Avisibly upset,@ Aemotional@ and Adistraught.@

Sergeants Gonzales and Roberts later arrived at the
interview room and took custody of appellant.  Sergeant Gonzales read appellant
his legal warnings, while Sergeant Roberts prepared the audio and video
equipment in the next room for recording. Sergeants Gonzales and Roberts then
took turns interviewing appellant.  While one asked questions, the other
watched and listened in the adjoining room.  Appellant=s interview was
recorded on videotape without his knowledge.

During the interview, appellant presented his version of
the events of the evening.  He explained that the complainant had gone to a
birthday party, and that he had been drinking alcohol and sitting in the
complainant=s vehicle listening to music while she was gone.  He
claimed that he had gotten the revolver out because he was home alone, and he
had been Athreatened@ by people in the
past.  He stated that after the complainant had returned home, the two of them
sat in the kitchen having drinks, talking, and watching television.  He denied
having an argument with the complainant, and claimed that the complainant had
told him to remove the revolver from the kitchen.  He described having
attempted to Atwirl@ the revolver with his finger in the
trigger guard before accidentally shooting the complainant.  He specified that
he was approximately two to three feet from the complainant when she was shot.








Appellant also attempted two demonstrations of how the
shooting occurred:  one to Sergeant Roberts, and the other to Sergeant
Gonzales.  Sergeant Roberts testified that, in his first demonstration,
appellant Awas bent over almost completely at the waist,@ at a 90-degree
angle.  Sergeant Roberts explained that, during appellant=s initial
demonstration, the revolver was Aagainst his waist@ and pointed
forward, and that had the revolver been fired from that position, the direction
of travel of the bullet would have been horizontal, Aalmost parallel to
the ground.@ Sergeant Roberts also testified that, in appellant=s second
demonstration, he stood at a different angle, which he described as Aa little more
straight up,@ with his knees bent, and held the revolver such that
the barrel was pointed Aat a slightly downward angle.@  Appellant
claimed that the revolver was Atrigger happy,@ and stated that
he never thumb-cocked the revolver because one time it accidentally discharged
in the back yard when he left it thumb-cocked.  He specified that he had not
thumb-cocked the revolver the night of the shooting, and that it was his
catching the weapon that caused it to accidentally discharge.

After the interview was over, Sergeant Roberts requested
appellant=s t-shirt for testing.  Sergeant Roberts then informed
appellant that the complainant had died, and directed Officer Budd to drive
appellant home.  After arriving home, appellant called Joseph Dawson, the
complainant=s father, to inform him of the shooting.  Dawson
testified that appellant told him, AI had an
accident.  I was cleaning my gun and it accidentally hit [the complainant]. 
And I would like to C I don=t know where she=s at.@  Dawson then
drove to appellant=s house, and the two went to Ben Taub
Hospital, where they confirmed that the complainant had, in fact, died from her
injuries.

Appellant was subsequently indicted on the felony offense
of murder.  At trial, the State presented the testimony of Keli Powers,
appellant=s daughter.  Keli testified that she had witnessed
appellant hit the complainant several times throughout her lifetime, and
specified that she had seen appellant hit the complainant on the back of the
head, slap, and push her.  She also stated that she had personally observed
black eyes, a busted lip, and other bruises on the complainant.  She recalled
that the complainant had left appellant in July 2006 due to this physical
abuse, but that she returned after being gone for only one day.  








Keli also testified that she had seen appellant with a gun
before, and that five years earlier, appellant had threatened to shoot her
after the two Aexchanged words.@  According to
Keli, appellant threatened, ABitch, you can leave my house or I will
kill you.@  She explained that he did not have a gun in his hand
when making this threat, but that he was going to get one, and that she saw him
with a gun after she had already left the house.  Finally, Keli explained that,
when the complainant=s vehicle was backed into the driveway, it
meant that appellant had been sitting in it, drinking, and listening to music.

The State also presented the testimony of Don Parrott,
appellant=s next-door neighbor of twenty years.  Parrott stated
that he had seen appellant sitting in the complainant=s vehicle,
drinking alcohol, and listening to music on several occasions.  He testified
that, on the night of the shooting, the complainant=s vehicle was
backed into the driveway, and he had heard music being played earlier in the
evening.  He also testified that he did not hear any arguments between
appellant and the complainant the night of the shooting, and that he did not
otherwise see anything going on between the two that night.

Parrott also stated that, approximately one month before
the shooting, he had observed appellant playing with the revolver while sitting
in the complainant=s vehicle and drinking alcohol.  Parrott
explained that, on this occasion, appellant Ahad his finger in
the trigger guard@ and was Atwirling it.@  Parrott stated
that he immediately went back into his house, but later heard Aloud voices@ coming from the
doorway of appellant=s and the complainant=s home.  Parrot
went outside, and heard appellant ask the complainant, ADo you want me to
kill you?@  Parrott testified that he was unable to see whether
appellant had the revolver while making this statement to the complainant.








Parrott also testified that, during the time they were
neighbors, he heard appellant get Arowdy,@ Abelligerent,@ and Adisagreeable,@ that he had seen
appellant in an intoxicated condition, and that he was Aworried@ about the
complainant.  He specified that he never witnessed appellant physically abuse
the complainant, and that he never observed any bruises, black eyes, or other
injuries on the complainant.  Parrott also explained that, despite his concern
for the complainant and appellant=s Aangry@ behavior, he
never called the police because he knew the complainant Adid not want to
leave,@ and nothing would
happen even if he had informed the authorities.

Finally, the State presented the testimony of Dr. Morna
Gonsoulin, the assistant medical examiner, and Mohamed Al-Mohamed, the firearms
examiner.  Dr. Gonsoulin testified that the complainant had been shot just
beneath her left collarbone, and that the path of the bullet within the
complainant=s body was left to right, downward, and front to
back.  She explained that the characteristics of the wound were consistent with
someone who had been shot while seated in a chair, directly facing the firearm,
which was held at an angle directly over their body.  Dr. Gonsoulin also
testified that, based on the distribution of soot particles on the complainant=s skin from the
muzzle of the revolver,[1]
she estimated that the complainant was shot from a distance of approximately
six to eighteen inches.  Dr. Gonsoulin opined that the complainant was most
likely shot from a distance of twelve inches, and specified that the distance
was not greater than eighteen inches because soot particles like those observed
on the complainant=s skin are Anot typically seen
beyond 18 inches from the muzzle.@








Al-Mohamed testified that the revolver fired appropriately
and was in good working condition, and that nothing was out of working
condition with the hammer or the trigger.  He explained that the revolver has
two safetiesCboth of which prevent the revolver from firing in the
event of an accidental impactCand that the revolver would not fire
unless someone simultaneously Apulled@ and Asqueezed@ the trigger.  He
stated that he performed a trigger analysis, and that between 13 and 13.5
pounds of pressure would be required to pull the trigger if the hammer of the
revolver were not cocked.[2] 
He also explained that the trigger must travel almost one inch to the rear
position to cause the hammer to cock and fall back, firing the bullet.

Al-Mohamed also testified that, based on ballistics tests
conducted with the revolver and a sample of fabric taken from the complainant=s robe, he
estimated that the complainant was shot from a distance of approximately
eighteen to thirty-six inches.  Al-Mohamed acknowledged that these tests were
performed under Acompletely different condition[s] than the
crime scene.@  He also stated that he examined the t-shirt worn by
appellant the night of the shooting, and that he did not find any gunshot
residue particles on the shirt.

The jury convicted appellant, and the trial court sentenced
him to thirty years= confinement in the Texas Department of
Criminal Justice, Institutional Division.  This appeal followed.

Issues
on Appeal

In two issues, appellant challenges his conviction for
murder.  In his first issue, appellant contends that the evidence supporting
the verdict is factually insufficient.  He asserts that the shooting of the
complainant was an accident, and argues that the contrary evidence presented at
trialCnamely
circumstantial and scientific evidence he alleges is consistent with his claim
of an accidental shootingCrenders the verdict clearly wrong and
manifestly unjust, and against the great weight and preponderance of the
evidence.  In his second issue, appellant contends that the trial court erred
in overruling his objection to an improper jury argument made by the State at
punishment.  We analyze appellant=s issues in the
order he has presented them.








Analysis
of Appellant=s Issues

I.        The
Evidence Supporting the Verdict is Factually Sufficient

In his first issue, appellant contends that the evidence
supporting the verdict is factually insufficient.  Appellant asserts that
evidence presented at trial demonstrated (1) he had no financial motive for
shooting or taking the complainant=s life; (2) he was
Adistraught@ and Aupset@ after the
shooting; (3) he was not intoxicated at the time of the shooting; (4) he did
not flee the scene, he called 911 twice, and he did not attempt to hide the
revolver; (5) there were no signs of struggle or violence at the scene; (6)
firearms can sometimes accidentally discharge; (7) someone Atwirling@ a revolver in the
manner described by appellant could Alose control over
it@; (8) the
complainant was shot only once; and (9) the  bullet wound was Anot to a portion
of [the complainant=s] body that one would normally associate
with a fatal wound, such as the head or heart area.@  He argues that
this contrary evidence presented is consistent with his claim of an accidental
shooting, and that it renders the verdict clearly wrong and manifestly unjust,
and against the great weight and preponderance of the evidence.

In contrast, the State contends that the evidence
supporting the verdict is factually sufficient.  The State asserts that
appellant repeatedly varied his explanation of how the shooting occurred and
contradicted himself about the circumstances surrounding the event, and that
the physical evidence presented at trial contradicted each of appellant=s various
accounts.  The State argues that, in light of the appellant=s varied
explanations and the physical evidence, the evidence is not so weak that the
verdict is clearly wrong and manifestly unjust, or against the great weight and
preponderance of the evidence.

A.      Standard
of Review and Applicable Law








When reviewing the factual sufficiency of the evidence, we
begin with the presumption that the evidence supporting the verdict is legally
sufficient. See Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App.
2006).  We view all of the evidence in a neutral light. See Cain v. State,
958 S.W.2d 404, 408 (Tex. Crim. App. 1997); Clewis, 922 S.W.2d at 134. 
We may set the verdict aside if (1) the evidence is so weak that the verdict is
clearly wrong and manifestly unjust; or (2) the verdict is against the great
weight and preponderance of the evidence. Watson v. State, 204 S.W.3d
404, 414B15 (Tex. Crim.
App. 2006) (citing Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). 
While we may disagree with the jury=s conclusions, we
must exercise appropriate deference to avoid substituting our judgment for that
of the jury, particularly in matters of credibility. Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005); see also Watson, 204 S.W.3d
at 414 (stating that an appellate court should not reverse a verdict it
disagrees with unless it represents a manifest injustice, though supported by
legally sufficient evidence).  Thus, while we are permitted to substitute our
judgment for that of the jury when considering credibility and weight
determinations, we may do so only to a very limited degree. Marshall v.
State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

A person commits the offense of murder if he (1)
intentionally or knowingly causes the death of an individual or (2) intends to
cause serious bodily injury and commits an act clearly dangerous to human life
that causes the death of an individual. Tex.
Penal Code _ 19.02(b)(1), (2).  Intent can be inferred from
the acts, words, and conduct of the defendant. Patrick v. State, 906
S.W.2d 481, 487 (Tex. Crim. App. 1995); see also Manrique v. State, 994
S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring).  Knowledge can
also be inferred from such evidence. Martinez v. State, 833 S.W.2d 188,
196 (Tex. App.CDallas 1992, pet. ref=d).

B.      Application
of Law to the Facts








Viewing all of the evidence in a neutral light, we conclude
that the evidence supporting the verdict is factually sufficient.  The evidence
is not so weak that the verdict is clearly wrong and manifestly unjust, and the
verdict is not against the great weight and preponderance of the evidence. Watson,
204 S.W.3d at 414B15.

First, although appellant claims that the shooting was
accidental, testimony presented at trial contradicts his claim.  Appellant gave
at least three inconsistent accounts of the shooting to investigating
officers:  (1) the version in which appellant claimed that he was Aplaying@ with the
revolver, it Ajumped@ out of his hand, he Acaught it by the
trigger,@ and accidentally
shot the complainant in the chest, as told to Officer Wheeler; (2) the version
in which appellant claimed that he was Ajuggling@ the revolver, he Athrew@ it too high in
the air, he Acaught@ it against his body, and it fired
accidentally, as told to a group of officers at the scene and to Officer Budd;
and (3) the version in which appellant claimed that he was Atwirling@ the revolver with
his finger in the trigger guard and accidentally shot the complainant, as told
to Sergeants Gonzales and Roberts.  

Appellant also gave at least three inconsistent accounts of
the circumstances surrounding the shooting:  (1) the version in which appellant
claimed that he was showing the revolver to the complainant to show her Ahow pretty it was,@ as told to a
group of officers at the scene; (2) the version in which appellant claimed to
have retrieved the revolver to show the complainant that he had Aprotection@ and would be Asafe@ if he left the
house, as told to Sergeant Barnes; and (3) the version in which appellant
claimed to have shot the complainant while Acleaning@ the revolver, as
told to Dawson.  In addition, appellant repeatedly contradicted himself
regarding whether he had been arguing with the complainant the night of the
shooting.  He also admitted to Sergeant Barnes that he had owned the revolver
for ten years, yet could not explain why he was showing the complainant Ahow pretty it was@ the night of the
shooting.








Next, scientific evidence presented at trial contradicted
appellant=s claim of how the shooting occurred.  Appellant=s repeated
demonstrations on videotapeCwhich themselves varied from one to the
nextCindicate that the
revolver was fired from the height of his waist, and that the bullet=s direction of
travel would have been nearly parallel to the ground.  Appellant also claimed
to have been a distance of two to three feet from the complainant when the
shooting occurred.  However, Dr. Gonsoulin testified that the characteristics
of the complainant=s injury were consistent with someone who
had been shot by a firearm held at an angle directly over their body, at a
distance of no more than eighteen inches.  Furthermore, although appellant
claimed that the revolver was not thumb-cocked, and that it accidentally
discharged when he Acaught@ it against his
body, Al-Mohamed testified that the revolver would only fire from this position
if someone simultaneously pulled and squeezed the trigger, applying between 13
and 13.5 pounds of pressure and moving the trigger a distance of approximately
one inch to the rear position.

Finally, while there was testimony presented at trial that
appellant was financially dependent on the complainant for support, that he was
Adistraught@ and Aupset@ after the
shooting, that he called 911 twice, did not flee the scene, and did not attempt
to hide the revolver, and that there were no signs of struggle or violence at
the scene, there was also testimony presented at trial that appellant
physically abused the complainant multiple times throughout the course of their
relationship, that he had threatened his own daughter with a gun approximately
five years earlier, and that he had threatened to kill the complainant
approximately one month before the shooting.  We are mindful that we must
exercise appropriate deference to the jury=s conclusions, and
must exercise appropriate deference to avoid substituting our judgment for
theirs. Drichas, 175 S.W.3d at 799; Watson, 204 S.W.3d at 414.  








Based on a neutral review of the evidence, we cannot
conclude that the evidence supporting the verdict is so weak that the verdict
is clearly wrong and manifestly unjust, or that the verdict is against the
great weight and preponderance of the evidence.  Therefore, we hold that the
evidence supporting the verdict is factually sufficient. See Ramirez v.
State, 229 S.W.3d 725, 728B30 (Tex. App.CSan Antonio 2007,
no pet.) (concluding that evidence supporting appellant=s murder
conviction was factually sufficient where appellant gave multiple inconsistent
accounts of the shooting, and scientific evidence refuted appellant=s claim that
complainant accidentally shot himself); Pieringer v. State, 139 S.W.3d
713, 720B23 (Tex. App.CFort Worth 2004,
no pet.) (concluding that evidence supporting appellant=s murder
conviction was factually sufficient where appellant gave multiple inconsistent
accounts of the day of the murder, and scientific evidence refuted appellant=s claim that she
had an innocent reason for her presence at crime scene); see also Salinas v.
State, No. 01-04-01079-CR, 2006 WL 488669, at *3B4 (Tex. App.CHouston [1st
Dist.] Mar. 2, 2006, pet. ref=d) (mem. op., not designated for
publication) (concluding that evidence supporting appellant=s murder
conviction was factually sufficient where appellant gave multiple inconsistent
accounts of the shooting, and scientific evidence refuted appellant=s claim that
complainant was shot accidentally).

We overrule appellant=s first issue.

II.       The
State=s Jury Argument at Punishment Was Not
Improper

In his second issue, appellant contends that the trial
court erred in overruling his objection to an improper jury argument made by
the State at punishment.  Appellant asserts that the State=s argument Ainferred [its]
knowledge of studies indicating that a domestic partner is more likely to harm
one at home than a stranger@ and therefore advised the jury of
prejudicial facts that were outside the record.  Appellant argues that the
trial court erred when it Afailed to respond@ to his motion to
disregard the objectionable portion of the State=s argument, and
asks this Court to remand the cause for a new punishment hearing.








In contrast, the State contends that the trial court
committed no error.  The State asserts that the trial court actually sustained
appellant=s objection to the allegedly improper argument.  The
State further asserts that its argument was a summation of the evidence
presented at both phases of trial and a reasonable deduction from that
evidence, and argues that even if the argument were improper, any error in its
admission was harmless.

A.      Applicable
Law

Proper jury argument includes four areas:  (1) summation of
the evidence presented at trial; (2) reasonable deduction drawn from that
evidence; (3) answer to the opposing counsel=s argument; or (4)
a plea for law enforcement. Jackson v. State, 17 S.W.3d 664, 673 (Tex.
Crim. App. 2000); LaHood v. State, 171 S.W.3d 613, 623 (Tex. App.CHouston [14th
Dist.] 2005, pet. ref=d).  To constitute reversible error, the
argument must be manifestly improper or inject new, harmful facts into the
case. Jackson, 17 S.W.3d at 673B74 (citing Gaddis
v. State, 753 S.W.2d 396 (Tex. Crim. App. 1988); Everett v. State,
707 S.W.2d 638, 640 (Tex. Crim. App. 1986)).

B.      Application
of Law to the Facts

During the State=s final argument
at punishment, the following exchange occurred:

[The State]:            [Appellant]
deserves to be punished.  The message should be loud and clear and resounding. 
Domestic violence is not acceptable.  We grow up in a world where our fathers
tell us:  Be careful when you go to the grocery store, be careful when you go
to the gas station, be careful when you go out at night and be careful of the
strangers.  My dad never told me be careful of the person who loves you.  The
facts are the person who loves you, the person you=re living with in your home behind
closed doors is more likely to be a threat to youC

[Defense Counsel]: Judge, this is
improper argument.

[The Court]:           Sustained. 
Move away from that line of argument.

[Defense Counsel]: Motion to
disregard, Your Honor.

[The State]:            Domestic
violenceC

[Defense Counsel]: Motion to
disregard, Your Honor.  Motion for mistrial.

[The Court]:           That
would be denied.








Appellant=s issue apparently
challenges the following portions of the State=s argument at
punishment:  (1) AThe facts are the person who loves you,
the person you=re living with in your home behind closed doors is
more likely to be a threat to you@; and (2) ADomestic violence.@








Here, the record contains evidence that appellant
physically abused the complainant on multiple occasions throughout her
lifetime, and had threatened to kill her approximately one month before the
shooting.  In addition to the testimony of Keli and Parrott, presented at
guilt/innocence and outlined above, the State offered the testimony of Clifton
Powers, Jr.Cappellant=s sonCat punishment. 
Clifton testified that he had lived at home with the complainant and appellant
until he was twenty-five years of age because he was Aworried@ about the
complainant and Adidn=t want nothing to
happen to her.@  Clifton explained that he had seen appellant Abeating@ on the
complainant numerous times throughout his lifetime, and specified that
appellant would Aslap@ and Abeat@ the complainant
when he Agot to drinking.@  Clifton also
testified that he had witnessed bruises and black eyes on the complainant Athe majority of
the time@ he visited the
complainant=s home.  We hold that the State=s argument was a
summation of the evidence presented at trial and a reasonable deduction drawn
from that evidence. See LaHood, 171 S.W.3d at 624 (concluding that State=s closing argument
was reasonable deduction from the evidence presented at trial; record contained
evidence that appellant committed violent crimes against the complainant, and
that he had physically and sexually assaulted another woman); see also
Watkins v. State, 946 S.W.2d 594, 598B99 (Tex. App.CFort Worth 1997,
pet. ref=d) (concluding
that State=s closing argument was a summation of evidence
presented at trial with a reasonable deduction from that evidence; argument was
based on testimony admitted at trial, and contained reasonable inferences drawn
from that testimony); Bonier v. State, 738 S.W.2d 726, 730 (Tex. App.CHouston [14th
Dist.] 1987, no pet.) (concluding that State=s closing argument
was summation of evidence presented at trial and reasonable deductions from
that evidence; argument did not inject prejudicial or incriminating facts that
were not in the record, and was based on testimony admitted at trial). 
Therefore, the State=s jury argument at punishment was not
improper.

Thus, assuming that the trial court overruled appellant=s objection to the
State=s jury argument at
punishmentCa question we need not and do not decideCwe conclude that
the trial court committed no error.  We overrule appellant=s second issue.

Conclusion

Having addressed and overruled each
of appellant=s issues, we affirm the trial court=s judgment.

 

 

 

/s/      Frank C. Price

Senior Justice

 

 

Judgment rendered
and Memorandum Opinion filed September 9, 2008.

Panel consists of
Chief Justice Hedges, Justice Boyce, and Senior Justice Price.*

Do Not Publish C Tex. R. App. P. 47.2(b).

 

 

 

 

 

 

 

 

_______________________________

* Senior Justice Frank C. Price sitting by
assignment.









[1]  Dr. Gonsoulin described the distribution of soot
particles from the muzzle of the revolver as Astippling.@





[2]  Al-Mohamed testified that between 4.2 and 4.75
pounds of pressure would be required to pull the trigger if the hammer were
cocked.